**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANGELISA BRUNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 24 C 1509 |
| v. | ) | |
| | ) | District Judge Thomas M. Durkin |
| | ) | Magistrate Judge Gabriel A. Fuentes |
| CARMAX BUSINESS SERVS., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this matter before the magistrate judge on referral from the district court for settlement (D.E. 26), attorney Russell S. Thompson IV has filed a Petition for Adjudication of Attorney Lien ("Petition"; D.E. 42) with respect to an attorney's lien he placed or sought to place on any settlement proceeds to be paid to Plaintiff Angelisa Brunson, his former client, in this matter. The Court reviewed the petition and heard evidence and argument at a telephonic hearing on September 3, 2024. (D.E. 46.) Attorney Thompson was present and argued, by telephone, at that hearing. The Court's adjudication of Thompson's attorney's lien is set forth below.

## BACKGROUND

This matter arises from Plaintiff's suit under the Fair Debt Collection Practices Act and the Illinois Uniform Commercial Code, alleging that after she went into default on her automobile loan from defendant Carmax Business Services, LLC ("Carmax"), Carmax hired defendant Madd Recovery, Inc., which does business under the name Bulldog Recovery ("Bulldog"), to repossess the vehicle, a 2021 Tesla Model Y ("the Tesla"). Plaintiff alleged in her lawsuit that during two attempted repossessions, on August 21 and October 20, 2023, Bulldog breached the peace during

the repossession attempts, entitling her to damages under Illinois law, 810 ILCS 5/1-101 *et seq*., and the FDCPA, 15 U.S.C. § 1692, *et seq*., against Bulldog and Carmax (collectively, "Defendants"). (Complaint: D.E.1, ¶¶ 24-44, 49-55, 59-60.)

Lien claimant Thompson, of the Thompson Consumer Law Group ("TCLG"), alleges that more than two months before he filed the Complaint on Plaintiff's behalf, Plaintiff entered into a contingency fee agreement with Thompson, containing her agreement to assign an attorney's lien to TCLG, for any unpaid attorney's fees or costs, on any claims related to his representation of her, including any money paid or payable to her in settlement. Petition at 2. More specifically, the Petition says Plaintiff agreed to pay TCLG the greater of (1) the total fees incurred by TCLG, determined by multiplying TCLG's actual time spent by the hourly rates agreed to in the Fee Agreement ($450 for Thompson and $400 for his colleague Gill); (2) the total fees awarded by the Court pursuant to an applicable fee-shifting statute; or (3) 40% of all amounts recovered under the claims (including damages, fees, costs, and debt waiver). *Id.*, Exh. A ¶¶ 5-7; Declaration of Russell S. Thompson, Exh. A ("Fee Agreement": D.E. 47-1). Thompson now claims that the total amount owed under his lien is $10,372.48, Petition at 6, as supported by his sworn affidavit stating that $9,800 of that amount was in fees, based on 5.8 hours by Thompson and 18.2 by colleague Jose Gill, at what Thompson avers were reasonable and customary hourly rates. *Id.*, Exh. A ¶¶ 7, 15. The remainder of the lien consists of filing and service fees. *Id.*, Exh. A ¶ 14.

After obtaining Plaintiff's agreement to Thompson's contingency fee arrangement, Thompson initially appeared for Plaintiff and filed the Complaint on her behalf on February 23, 2024. He filed returns of summonses on Plaintiff's behalf on March 11, 2024. (D.E. 5, 6.) After Carmax filed an answer and counterclaim (against Plaintiff for the substantially unpaid balance on her automobile loan) (D.E. 9), Thompson, still as Plaintiff's counsel, filed three unopposed

2

motions for extensions of time to answer the counterclaim (D.E. 15, 18, 20), each of which was granted, giving Plaintiff until June 17, 2024, to answer.

But two weeks after the third extension was granted, Thompson filed a motion to withdraw as counsel for Plaintiff in the case. ("Motion to Withdraw"; D.E. 22.)   At the time of filing of the motion to withdraw on May 30, 2024, no initial status report had been filed in the case, the parties had yet to advise the Court of their expectations on discovery, and the Court had not entered any discovery schedule.  The initial status report was due on July 1, 2024. (D.E. 21.)  Thompson's stated grounds for withdrawal were that because Brunson had made the representation unreasonably difficult, TCLG was allowed or even required to withdraw under the Illinois Rules of Professional Conduct.  *Id.* ¶¶ 2-4.

At the telephonic hearing, after Plaintiff appeared, acknowledged having seen the Motion to Withdraw, and stated that she did not object, the district court granted the Motion to Withdraw. 6/6/24 Tr. (D.E. 45) at 2-3.  She also stated that she understood that she would have to obtain another lawyer or proceed *pro se*.  *Id.* at 4. Asked if she was trying to obtain another lawyer, Plaintiff said she was "attempting to go *pro se*."  *Id.*

The subjects of settlement and of Thompson's attorney's lien arose briefly at the end of the June 6 hearing on the Motion to Withdraw.  The district court had told the parties that if they wished to engage in a settlement conference with the magistrate judge, pro bono settlement assistance counsel may be available to Plaintiff. The district court also said it would refer the case to the magistrate judge for settlement if the parties expressed a genuine interest in settling the matter.  6/6/24 Tr. at 6-8.  Thompson then interjected a question that constituted the June 6 hearing's sole reference to his attorney's lien, which he characterized as arising from the contingency fee agreement he had with Plaintiff:

> MR. THOMPSON: Our -- as -- as part of taking this case on a contingency fee basis, our firm actually has an attorneys' lien for the fees and costs we've incurred thus far, and I was wondering if the Court, you know, had a preferred way for us to handle that. I don't want to throw too much of a wrench in the settlement negotiations, but -- but we do have that -- that lien due to work that we've done so far in the case.
>
> THE COURT: That's between you, your client, and the defendants, not me, so work it out.
>
> MR. THOMPSON: All right. Thank you.

*Id.* at 9. Eight days later, the district court referred the matter to the magistrate judge for a settlement conference. (D.E. 24, 25, 26.)

Even during the pendency of the Motion to Withdraw, and then after withdrawal was granted as the contours of a settlement conference began to percolate before the magistrate judge, Thompson was communicating with the parties and their counsel concerning his lien claim, according to the Petition. As early as June 6, the telephonic hearing date for Thompson's Motion to Withdraw, Thompson "advised" persons including Plaintiff, by email, of his lien on her claims. Petition at 2. In the meantime, the magistrate judge on June 27 set the matter for a pre-settlement conference, at which Plaintiff consented to the magistrate judge's recruitment of settlement assistance counsel, who filed a limited appearance on July 9. (D.E. 29, 31, 32.) Thompson averred in the Petition that he notified Plaintiff's settlement counsel of the lien by email on July 11, two days after settlement counsel appeared in the case. Petition at 2. Told by settlement counsel that the lien was not perfected because notice had reached only Defendants' counsel and not Defendants directly, Thompson sent notice letters concerning his lien claim to Defendants by certified mail on or about July 16, 2024, and Defendants received the letters by July 22. *Id.,* Exh. A ¶¶ 3-4. Thompson asserts that, accordingly, his lien "was perfected no later than July 22, 2024,"

and "Defendants must retain sufficient funds from the amount of any settlement (or judgment) to satisfy TCLG's valid and perfected lien." *Id.* at 5.

The magistrate judge set a settlement conference for August 20, 2024, and held the conference on that date. (D.E. 36, 38.) During the conference, the Court included Thompson (and his lien claim) in the mediation, but the lien claim was not resolved. (D.E. 40, 41.)[1] Thompson then filed the instant Petition to have the lien adjudicated. The Petition argued that Thompson has a valid and perfected statutory attorney's "charging lien" under the Illinois Attorney's Lien Act, 770 ILCS 5/1, and that Thompson (or TCLG, and the Court refers to the attorney and the firm interchangeably for purposes of the Petition) also has right to a *quantum meruit* recovery (i.e., an equitable lien) for the fees and costs representing the reasonable value of his services before his withdrawal. Petition at 3-6.

Acting pursuant to the district court's settlement referral, the Court held its telephonic evidentiary hearing to adjudicate the lien on September 3, 2024. (D.E. 46.) As the Court disclosed to the parties and Thompson before the hearing (D.E. 44), the evidentiary hearing's focus would need to be on whether Thompson could establish "good cause" (discussed further below) for his withdrawal under Illinois law, insofar as Illinois law requires an evidentiary hearing before a court can find that an attorney can assert a *quantum meruit* claim for the value of services rendered after a withdrawal is determined to be for "good cause." *See Dikmen v. People's Gas Light & Coke Co.*, 2023 IL App (1st) 221806-U ¶¶ 23-31, 2023 WL 5935750, at *4-6 (Ill. App. Ct. Sept. 12, 2023).

---

[1] The specific details of the settlement conference discussions, including any agreement reached by the parties and any matters discussed with Thompson, are settlement confidential by agreement of the parties and the magistrate judge, not admissible to prove any claim or defense under Federal Rule of Evidence 408, and thus not recited here.

At the telephonic evidentiary hearing, the Court took sworn testimony from both Plaintiff and Thompson. (9/3/24 Tr. (D.E. 48), passim.) Brunson, through her settlement assistance counsel, Francis R. Greene (whom the Court thanks for his volunteer services related to settlement including the attorney's lien adjudication hearing ancillary to settlement), appeared and expressly waived her attorney-client privilege as to attorney communications with Thompson concerning his withdrawal. *Id.* at 11. Thompson testified that the circumstances of his withdrawal as Plaintiff's counsel effectively began in late March 2024, after Carmax filed its answer and counterclaim against Brunson. *Id.* at 13. On April 5, Gill "had a call" with Brunson to discuss the counterclaim and to "discuss strategy" about it. *Id.* The Court presumes here that Plaintiff had to answer that counterclaim, which asserted Plaintiff's unpaid debt on her contract with Carmax for purchase of the Tesla. *See* Carmax Answer and Counterclaim (D.E. 9). Thompson testified that at the time of Gill's April 5 telephone conversation with Brunson, at least Brunson was "not open to the strategy that our firm proposed and suggested some ideas of her own. So during that call she was requested to put those ideas in an email so that we could review them as a firm, discuss them, and reconvene the strategy with her. She agreed to that, that plan moving forward." *Id.* at 13-14.

Ten days passed, and TCLG had not heard from Brunson, so Gill sent her a follow-up email, Thompson testified. *Id.* at 14. TCLG filed its first motion to extend the time for answering the counterclaim on the next day, April 16, he said. *Id.* "We still did not hear from Ms. Brunson after that," he testified. *Id.* On April 30, Gill called her again and sent another follow-up email, Thompson testified. *Id.* This time Brunson returned the phone call, but Gill was unavailable to field that call, Thompson testified. *Id.* Gill called her again later that day but received no answer, Thompson testified. *Id.*

On May 1, the next day, Gill called again, leaving Brunson a voicemail, Thompson testified. *Id.* Brunson responded to the voicemail by sending Gill an email, "saying that she was at the hospital and needed to reschedule the call for the next day, May 2nd," Thompson testified. Gill "responded to that email" by asking Brunson's availability for a call on May 2, but Brunson did not respond, Thompson said. *Id.* On or about May 2, TCLG filed the second motion to extend the time to answer the Carmax counterclaim, he testified. *Id.* Another week passed with TCLG not hearing from Brunson, "so Mr. Gill sent another follow-up email requesting her availability for a call," Thompson testified. *Id.* at 15.

After not hearing from her for another four days, on May 13, TCLG "sent another follow up," Thompson testified. The next day, May 14, TCLG called her again, reached her voicemail, but could not leave a message because the voicemail box was full, Thompson testified. *Id.* Thompson testified that 39 days by then had passed without "contact from her" (or without being "able to converse with her"), so Gill then sent "a detailed email to Ms. Brunson, again about the counterclaim, summarizing the timeline of our attempts to speak with her to prepare the answer and advise that we would need to terminate the representation if we did not hear from her the next day." *Id.* After TCLG did not hear from her the next day, TCLG filed its third motion to extend the time to answer on the following day, May 16, he testified. *Id.* The district court granted that third extension motion on May 16, giving Plaintiff another month to answer the Carmax counterclaim, to June 17. (D.E. 21.)

Two more weeks passed without TCLG hearing from Brunson, and TCLG filed its Motion to Withdraw, Thompson testified. *Id.* TCLG still received no response from her after it sent her a May 31 email about the district court's having set its telephonic hearing on the Motion to Withdraw, Thompson testified. *Id.* At the June 6 telephonic hearing, Brunson in fact called to

participate in the hearing. 6/6/24 Tr. at 2. Her telephonic appearance at the hearing was "a surprise" to TCLG, Thompson testified. 9/3/24 Tr. at 16. "We were pleased that she appeared and consented to our withdrawal," he testified. *Id.*

Testifying at this Court's September 3 evidentiary hearing, Thompson summed up TCLG's communications (or lack thereof) with Brunson by testifying that TCLG had been "unable to communicate" with Brunson for about two months as of the filing of the Motion to Withdraw, and that therefore, TCLG was "unable to formulate an answer to the counterclaim." *Id.* Thompson attributed TCLG's inability to formulate an answer to "the disagreement and the strategy on the case based on the phone call on April 5th." *Id.* Thompson also referred to the Fee Agreement, testifying that it included Brunson's agreement that TCLG could withdraw from representing her for reasons including "good cause as to the client's breach of the contract, the client's refusal to cooperate with the attorneys or follow their advice on material matters." *Id.* at 16. Thompson testified that Brunson "breached the contract by failing to cooperate with counsel," supplying TCLG with "good cause for withdrawal under Professional Rule 1.16(a)(6)" because she had rendered the representation "unreasonably difficult." *Id.* at 16-17. In the end, despite giving Brunson "numerous opportunities" to talk to TCLG about "[where] the claims and counterclaims, would go," the TCLG attorneys "just were unable to do so," Thompson testified. *Id.* at 17.

As for the involvement of settlement strategy in TCLG's withdrawal from its representation of Brunson, Thompson testified that the April 5 call between Gill and Brunson included at least some discussion of "strategy which involved settlement goals … as it relates to the counterclaim." *Id.* at 21. Thompson was not aware, as of the time of his June 6 withdrawal from the case, of any settlement offer from any defendant in the case, and "I personally did not

have such a discussion" between TCLG and Plaintiff about any settlement offer, he testified. *Id.*
at 22. "I don't believe there was one on at the table – on the table at the time," he said. *Id.* at 22.

Brunson countered, in her testimony, that she had trouble communicating with Gill (her
point of contact at TCLG from the start of the attorney-client relationship, and that the withdrawal
surprised her because she thought she had an understanding with Gill that they would continue to
communicate:

> [W]hen I first brought on Jose Gill as the attorney that I was going to use, the
> communication was already off with Mr. Gill. I had been trying to get in contact
> with him in the beginning several times. And throughout our, I guess, agreement,
> it was hard to get in contact with him because he had certain things going on that
> he would tell me about …. I didn't know that they were going to withdraw because
> I don't – I had – I ended up having a surgery. So I didn't know they were going to
> withdraw just off of the fact that we were always understanding that – well, at least
> meaning Mr. Gill – were always understanding of we'll get back to each other and
> talk …. I had an understanding that we were going to get back to each other.

9/3/24 Tr. at 25-26. Of her mode of communication with Gill and TCLG, she added:

> In the very beginning, I expressed to Mr. Gill that when we weren't able to contact
> each other and it was hard – because it was like a back and forth like we were
> playing phone tag, we weren't able to contact each other. So I informed him that
> my preferred method of contact was text message because, you know, first of all,
> my phone is broke, my voicemail gets full …. But when I told Mr. Gill that my
> preferred method of contact was text message, he kind of glazed over that. Like he
> didn't even really acknowledge it …. But, yes, we – it was like we had an
> understanding because Mr. Gill would say that he would contact me and he couldn't
> because he had things going on with his children and he – at one point he was sick
> really bad and he couldn't talk to me for a couple of weeks. But I – I didn't know
> that it would come to the point of them withdrawing …. I saw the email that they
> were withdrawing, it was the day before the hearing for them to withdraw. I didn't
> know that I could object until I got on the line, and, you know – because they said
> I had to be there in the email. So I – I'm sorry.

*Id.* at 26-27. She later returned to the subject of the email communications, testifying that "I
remember responding to a couple of emails, like a little bit after I received them. But I didn't see
the majority of the emails until after they planned to withdraw." *Id.* at 28. She further testified:

> [T]hroughout the client relationship, it was kind of hard for me to keep up with emailing. My preferred contact method is text message. So I'm not an email person where I just am checking my emails all day long. Like I don't have any notifications coming to my phone for emails.

9/3/24 Tr. at 29.

As for Plaintiff's understanding of the meaning and significance of her not objecting to TCLG's withdrawal, Brunson testified as follows:

> And the judge asked me do I want to object. Well, I don't really know what – what that means. I just know that he is saying that he wants to withdraw. So I said no. I guess I didn't really understand. But once I withdrew, the judge then said because I – he asked me if I wanted to go *pro se*. And I assumed that that meant in my own, I guess, because at that point I basically figured out that, well, you're on your own. And I said yes.

*Id.* at 27.

Thompson then cross-examined Brunson, beginning by having her confirm that she signed the Fee Agreement. *Id.* at 29. She testified that she did not remember the Fee Agreement including her agreement that the attorneys would communicate with her by email, though she did not disagree with Thompson that it did. *Id.* at 29-30. She largely did not remember Gill's April 5 call or his attempts to reach her by email about answering the Carmax counterclaim, she testified. *Id.* at 30-31. She testified that she did remember receiving Gill's May 14 email to her about TCLG possibly withdrawing if it did not hear from her, but she said she did not actually read it until "the day before the hearing, I guess," at about 10 p.m. (the Court construes that date as June 5, 2024), and she further admitted on cross-examination that she did not reach out to Gill or anyone else at TCLG that night or the morning before, as "it was late at night" on June 5, and on June 6, "the hearing was in the morning." *Id.* at 31-32.

Thompson's cross-examination then turned to the communications issues between Brunson and TCLG. She agreed that "there were communication issues" but attributed them to

how "my preferred method of contact wasn't, you know, taken seriously." *Id.* at 32. Thompson

asked her whether TCLG agreed "in the attorney-client agreement" (and the Court presumes here

that Thompson was referring to the Fee Agreement, as it is the only document in the record setting

forth an agreement between TCLG and Brunson) to text her, and she said she did not recall. *Id.* at

32-33. On redirect, Brunson reiterated that "I guess I would just ask why my method of

communication that I asked of Mr. Gill wasn't, I guess, acknowledged by the Thompson group if

they knew that – if I had told them that I could be reached easier in texting, why they didn't oblige

by that." *Id.* at 33.

> Thompson offered a brief, sworn rebuttal that was mostly argument:
>
> I would just say, as rebuttal, I would just provide my testimony that in agreeing to
> the representation with Thompson Consumer Law Group, Ms. Brunson did agree
> that by providing the firm with her email address, that attorneys may communicate
> with her by email. And she was further advised that attorneys will email client
> details as to the status of the case and relevant documents for review by email. So
> Ms. Brunson was well aware that the communications would be via email. During
> the course of our numerous attempts to get in contact with her to discuss the
> counterclaim, she responded by email. So she was well aware that the firm was
> trying to each her both via phone and via email. And her failure to check her emails
> regularly knowing those communications were necessary rendered the
> representation unreasonably difficult, if not impossible, and required withdrawal.

*Id.* at 34-35.

Thompson then testified that TCLG had engaged in a course of email communication with

Brunson from its first "welcome letter" communication to her in December 2023, noting that

TCLG's initial "intake process," he said, was "via telephone, text, and email." *Id.* at 36. TCLG's

course of email communication with Brunson continued through January, February, April and May

2024, so that "telephone and email were both regular forms of communication," and "she

communicated with the firm in the same ways." *Id.* Then in the April 5 call with Gill, Thompson

testified, Brunson agreed (though, as recited above, she did not recall doing so) to Gill's express

request (which took the form of hearsay when Thompson testified to it, as the Court stated) that she put her "ideas" into an email back to him "so that the firm could consider them as part of reconvening later to discuss the strategy." *Id.* at 36-37. Asked if the "welcome letter" and the Gill emails of March through May (and not the Fee Agreement) expressly warned Brunson that she needed to monitor her emails and that communication with TCLG would have to be by email, Thompson testified: "[O]ther than the attorney-client agreement, I don't believe so." *Id.* at 37. The Court then ordered Thompson to file the Fee Agreement, which had not been attached to the Petition. *Id.* at 38-40. Thompson offered no other evidence, including in the form of any testimony from Gill, in rebuttal.

The evidentiary hearing moved to the argument phase. For the sake of clarity, the Court summarizes Thompson's arguments as follows:

- The Thompson or TCLG statutory lien under the Illinois Attorney's Lien Act is enforceable as a purely statutory lien based on the Fee Agreement with Brunson, even if Thompson did not fully perfect his statutory lien (by notifying Defendants) until July 22, more than six weeks after his attorney-client relationship with Brunson ended on June 6. *Id.* at 41; Petition at 4-6.

- Thompson and TCLG had an enforceable equitable lien, Petition at 3, notwithstanding TCLG's withdrawal from the representation having become effective on June 6, because:

  o The "difficulties in communication" between Brunson and TCLG stemmed from Brunson's failure to communicate by email and by phone, despite those being common means of communication and means Brunson had used to communicate with TCLG. 9/3/24 Tr. at 42. Moreover, Thompson also argued that Brunson breached the Fee Agreement (her contract with TCLG) by not maintaining proper communication with the firm or not responding to its inquiries of her. *Id.* at 16.

  o TCLG had a "pretty clear disagreement" with Brunson over strategy about how to respond to the Carmax counterclaim, and TCLG could not work through those differences with Brunson because it was "just simply unable to communicate" with her for some two months during the pendency of TCLG's three successive motions to extend the deadline for answering the counterclaim. As Thompson put it, without having worked through those differences, "our firm's hands were pretty much tied such that we could not file an answer without her assistance." He added that

"getting another extension seems a pretty big uphill battle, and our firm was kind of getting our backs put against the wall." *Id.* at 42.

o TCLG at that point had an ethical duty that "required us to withdraw, as we could not adequately represent Ms. Brunson moving forward," and thus "good cause" existed for the withdrawal. *Id.* at 43; *see also* Petition at 2 ("the ethical rules required TCLG to seek withdrawal as her counsel").

o The district court already has implicitly "found the grounds to withdraw" on June 6 when the district court granted the Motion to Withdraw upon Brunson not objecting to it. 9/3/24 Tr. at 43.

On Brunson's behalf, her current pro bono settlement counsel argued that TCLG made insufficient efforts to contact Brunson "in a manner other than email," did not reach out by phone very often, and did not honor her request to be contacted by text message. *Id.*

That argument prompted Thompson to make a brief rebuttal argument that the Court quotes in full, because it represents an important piece of TCLG's reasoning as to why it has an enforceable equitable lien for *quantum meruit* recovery after withdrawal, per the Illinois common law requiring "good cause" for such withdrawals if equitable attorney's liens are to be enforceable:

> And the firm simply doesn't – doesn't have an ability to text current clients. *It is not a function of any of our active practice management software, and employees are not issued personal cell phones for communicating with clients, which is why our firm communicates via telephone and email.* And, again, it is not unreasonable to do so. *And Ms. Brunson expressly agreed to the communications via email.* So sufficient attempts were made to communicate with her and good cause exists.

*Id.* at 44 (emphasis added).

The Fee Agreement itself, filed with the Court on September 3, contains various relevant provisions, including Brunson's grant to TCLG of a lien on any settlement proceeds or recovery (as described above), Brunson's agreement to keep TCLG advised of her "whereabouts" and to "cooperate" with TCLG's prosecution of her claims, including by "comply[ing] with all reasonable requests made in connection with the preparation and presentation of the claims." Fee Agreement

¶¶ 4, 9. The Fee Agreement makes three references to the means by which TCLG would communicate with Brunson, or to how Brunson ought to expect TCLG to communicate with her.

First, the Fee Agreement stated that TCLG reserved the right to dismiss Brunson's claims without prejudice "if Client becomes unavailable and/or unresponsive to e-mail and telephonic messages, as determined by Attorneys, subject to the provisions of paragraph 13 below." *Id.* ¶ 8.

Second, Paragraph 13 stated that Brunson would owe fees to TCLG "[i]f you become unresponsive or otherwise act[] in a manner such that Attorneys must withdraw from the case under applicable ethical rules." *Id.* ¶ 13.

Third, the Fee Agreement's most specific provision on how Brunson and TCLG were to communicate, and particularly with respect to email versus other communications methods, read as follows:

> By providing Attorneys with an e-mail address, you agree that Attorneys may communicate with you via e-mail. Attorneys will e-mail Client details as to the status of the case and/or send relevant documents for review via e-mail. *However, e-mail will not be used as an exclusive means of communication and Attorneys will always welcome any phone calls, letters, or other means of communication.*

*Id.* ¶ 12 (emphasis added). That last line of Paragraph 12 of the Fee Agreement was not mentioned at the evidentiary hearing, but it is now before the Court.

## ANALYSIS

The Court, exercising supplemental jurisdiction over the Thompson lien claim that arose during settlement discussions, analyzes the claim substantively under applicable Illinois law. Illinois law provides that once notice of the lien is served, "'the attorney in effect becomes a joint claimant with his client . . . in the proceeds of any settlement that may be made by the client, and to the extent of the amount of his fee has the same interest in such proceeds . . . as his client and is entitled to his *pro rata* share thereof.'" *Kovitz Shifrin Nesbit, P.C. v. Rossiello,* 392 Ill. App. 3d

1059, 1064 (1st Dist. 2001), quoting *People v. Philip Morris, Inc.,* 198 Ill. 2d 87, 97-98 (2001). As a result, any settlement reached by the parties on August 20 cannot proceed in disregard of the lien, *id.*, so the Court arranged to have the Thompson lien adjudicated promptly after it was not resolved at mediation. The Court discusses below the applicable legal principles and analysis necessary to adjudication of the Thompson lien claim.

## I.   The Court Has Supplemental Jurisdiction To Adjudicate the Lien Claim.

District courts may exercise supplemental jurisdiction over disputes between attorneys and clients concerning costs and fees for representation in matters pending before the district court. *Goyal v. Gas Tech. Inst.,* 718 F.3d 713, 717 (7th Cir. 2013); *see also Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1299-1300 & n.5 (7th Cir. 1995) (collecting cases and stating that "supplemental jurisdiction generally has been asserted over attorney's fee disputes when the disagreement arises between the client and the lawyer"). Supplemental jurisdiction does not extend, however, to attorney fee disputes after the case has been dismissed and jurisdiction has been relinquished. *See Hill v. Baxter Healthcare Corp.,* 405 F.3d 572, 576-77 (7th Cir. 2005) (district court did not retain supplemental jurisdiction to resolve a dispute over a motion to quash an attorney fee lien where the district court had dismissed the case with prejudice, thus terminating federal jurisdiction); *Shapo v. Engle,* 463 F.3d 641, 644-45 (7th Cir. 2006) (no supplemental jurisdiction to enforce attorney-client master fee agreement after district court approved settlement and dismissed case). Here, the case has not been dismissed, and jurisdiction has not been relinquished. Rather, the parties engaged in a settlement conference, but no order has been entered dismissing the case or stating whether or not a settlement was achieved, pending adjudication of the Thompson lien claim. (D.E. 38, 40.) At the September 3 evidentiary hearing, neither Brunson nor Thompson disputed the Court's independent determination that it has supplemental jurisdiction over the adjudication of the Petition. 9/3/24 Tr. at 4-5.

15

II.  **Thompson Failed To Perfect His Statutory Lien Until After He Withdrew and Also Cannot Recover Under Quantum Meruit Because His Withdrawal Was Not for "Good Cause" Under Illinois Law.**

The Petition asserts a statutory attorney's lien under the Illinois Attorneys' Lien Act, 770 ILCS 5/1, *et seq.* ("the Act"), and argues that this lien was perfected properly under Illinois law so that it validly encumbers any settlement proceeds payable in the case. The Court respectfully disagrees, but that is not the end of the inquiry under Illinois law because the Petition also seeks recovery under a *quantum meruit* theory for the reasonable value of Thompson's services rendered before he withdrew. The Petition's posture requires the Court to consider Thompson's lien claim under both a statutory and equitable analysis.

A.  **The Court Concludes, As a Matter of Law, that Thompson's Statutory Lien Claim Fails Because He Perfected the Lien Well After the End of the Attorney-Client Relationship.**

Perfection of attorneys' liens under the Act is governed by the Act, but courts require strict compliance with the Act in order for the lien to be valid. *In re Kleckner*, 93 B.R. 143, 145 (N.D. Ill. 1988). The Act provides as follows:

> Attorneys at law shall have a lien upon all claims, demands and causes of action, including all claims for unliquidated damages, which may be placed in their hands by their clients for suit or collection, or upon which suit or action has been instituted, for the amount of any fee which may have been agreed upon by and between such attorneys and their clients, or, in the absence of such agreement, for a reasonable fee, for the services of such suits, claims, demands or causes of action, plus costs and expenses. In the case of a claim, demand, or cause of action with respect to which the total amount of all liens under the Health Care Services Lien Act meets or exceeds 40% of the sum paid or due the injured person, the total amount of all liens under this Act shall not exceed 30% of the sum paid or due the injured person. All attorneys shall share proportionate amounts within this statutory limitation. If an appeal is taken by any party to a suit based on the claim or cause of action, however, the attorney's lien shall not be affected or limited by the provisions of this Act.

> To enforce such lien, such attorneys shall serve notice in writing, which service may be made by registered or certified mail, upon the party against whom their clients may have such suits, claims or causes of action, claiming such lien and

16

stating therein the interest they have in such suits, claims, demands or causes of action. Such lien shall attach to any verdict, judgment or order entered and to any money or property which may be recovered, on account of such suits, claims, demands or causes of action, from and after the time of service of the notice. On petition filed by such attorneys or their clients any court of competent jurisdiction shall, on not less than 5 days' notice to the adverse party, adjudicate the rights of the parties and enforce the lien.

770 ILCS 5/1 (2003). In *Kleckner*, for example, the lien claimant did not serve the adverse parties (against whom the lien was asserted) by registered or certified mail, as the Act required, but rather relied on the provable actual notice that those parties received. 93 B.R. at 145. But the court ruled that even actual notice was not good enough, even if it was consistent with statutory intent, so no valid statutory attorneys' lien was created. Here, after Plaintiff's settlement counsel helpfully advised Thompson that his service of the lien notice on Defendants' counsel (and not Defendants themselves) was insufficient, Thompson took steps to remedy that problem by serving the Defendants themselves by certified mail, accomplishing this by July 22, 2024, when Defendants received the letters. Petition at 2, 5.

Ordinarily, that might be enough to establish a valid statutory lien, based on Thompson's having sent the certified mail letters to Defendants for receipt on July 22. But when an attorney-client relationship that was originally established under a contingent fee contract terminates, the contract no longer exists and neither party can therefore seek to enforce the terms of the nonexistent contract. *Royce v. Michael R. Needle, P.C.*, 950 F.3d 481, 485 (7th Cir. 2020), citing *Forest Pres. Dist. of Cook Cty. v. Cont'l Cmty. Bank & Tr. Co.*, 2017 IL App (1st) ¶ 48. Put more bluntly, "the attorney must serve notice of the lien on the defendant while the attorney is representing the client; if that attorney-client relationship is terminated for whatever reason before notice of that lien is served, the lien is unenforceable." *Kennedy v. MKF I & II, Inc.*, 2022 IL App (1st) 192158-U ¶ 3, 2022 WL 4484074, at *1 (Ill. App. Ct. Sept. 27, 2022), citing *Rhoades v. Norfolk & West Railway*

*Co.*, 78 Ill. 2d 217, 222 (1979) and *In re Chicago Flood Litig.*, 289 Ill. App. 3d 937, 943 (1st Dist. 1997). "Clearly, as we have previously stated, where the attorney withdraws from the case, he cannot recover under the former contingent fee contract, because the withdrawal works to rescind the contract." *Kannewurf v. Johns*, 260 Ill. App. 3d 66, 75-76 (5th Dist. 1994), citing *Leoris & Cohen, P.C. v. McNiece*, 226 Ill. App. 3d 591 (2d Dist. 1992).

Accordingly, Thompson's argument that his lien under the Act is valid because he completed service on Defendants on July 22 fails because Thompson moved to withdraw on May 30, nearly two months earlier, and any doubt about the end of this attorney-client relationship evaporated on June 6, when the Court granted the Motion to Withdraw, and Thompson officially exited the case. Thompson's service of the lien notice on the Defendants occurred a month and a half later, on July 22.

### B. Thompson's Withdrawal Was Not for "Good Cause" Under Illinois Law, in the Absence of a "Complete Breakdown in the Attorney-Client Relationship."

Thompson's failure to perfect his statutory lien before the end of the attorney-client relationship does not end the Court's analysis. That is because Illinois law protects attorneys and their interest in being paid for their work by allowing them to pursue *quantum meruit* claims for "reasonable fees for services rendered" when they are discharged with or without cause. *Rhoades*, 78 Ill. 2d at 229-30. But Illinois law also allows attorneys to pursue equitable lien claims to be paid for the work they performed before they withdrew in a case, under a *quantum meruit* theory. Consequently, the statutory lien under the Illinois Attorney's Lien Act is separate from the common law remedy of *quantum meruit*, so that an inability for the attorney to recover under the strictly construed statutory lien does not preclude the *quantum meruit* recovery. *See Kannewurf*, 260 Ill. App. 3d at 76 ("the attorney lien statute … is to be strictly construed but is in addition to, and not instead of, the common law remed[y] … of *quantum meruit*").

This species of *quantum meruit* equitable attorney's lien claim, made after an attorney's withdrawal, requires that the attorney have withdrawn for what the Illinois courts have called "good cause." *Dikmen*, 2023 WL 5935750, at \*3-4, citing *McGill v. Garza*, 378 Ill. App. 3d 73 (1st Dist. 2007); *Reed Yates Farms, Inc. v. Yates*, 172 Ill. App. 3d 519, 527 (4th Dist. 1988). Where good cause is at issue, courts must hold an evidentiary hearing to make the determination. *Dikmen*, 2023 WL 5935750, at \*4-6.

### C. A Paradigm for a "Good Cause" Withdrawal in Support of an Illinois Equitable Attorney's Lien Is the Settlement Scenario, Not Present Here.

The rationale behind allowing an equitable lien after withdrawal is not difficult to understand. Once the attorney performs work, often under a contingent fee agreement as is the case here, and once that work places the client in a position to gain the benefit of that representation after either the attorney's discharge or the attorney's withdrawal, the attorney should be paid for that work, or at least should receive the reasonable value of those services once they bear fruit in the form of settlement funds or other benefits flowing into the client's pocket  Settlement negotiations represent a paradigm case:  If an attorney litigates a case to settlement posture and then works on cutting a favorable settlement for a client who refuses to negotiate or refuses to accept the deal, and then the attorney is discharged or withdraws as a result of the disagreement, why should the attorney wind up with nothing if the client closes that deal or a similar deal and gains the benefit of the contingency fee bargain? The normative response is that the attorney ought to have a mechanism to be compensated, and that is precisely what Illinois provides by allowing equitable liens for *quantum meruit* recovery after withdrawal, so long as the withdrawal was for good cause. Commonly, then, clients whose attorneys withdraw amid the clients' refusal to accept a settlement proposal and then settle the case afterward may not avoid their former attorney's

equitable lien on the settlement proceeds brought about in significant part by the former attorney's efforts.

That settlement paradigm appears in *Kannewurf*, a case in which the plaintiff and the attorney who withdrew disagreed about whether the plaintiff ought to accept a settlement offer, and the Illinois Appellate Court rejected the plaintiff's argument that no equitable attorneys' lien could attach to the settlement proceeds. 260 Ill. App. 3d at 72-73  In *Dikmen*, the Illinois Appellate Court, citing *Kannewurf*, reached the same conclusion, remanding for evidentiary hearing on the good cause question but making clear that a disagreement between attorney and client over whether to accept or a settlement offer recommended by the attorney *would* constitute good cause for withdrawal.  *See Dikmen*, 2023 WL 5935750, at *4 ("Our reading of Illinois cases clearly establishes that the disagreement between Dikmen and Kelly & Karras about whether to settle or the amount of a proposed settlement can constitute good cause for the firm to withdraw and recover the value of the services provided on a *quantum meruit* basis.")

In this case, the evidence showed that Thompson played virtually no role in the negotiation of a settlement in this matter, as attorney Greene represented Plaintiff pro bono throughout the settlement talks that began after Thompson's exit from the case.  Thompson presented no evidence that any settlement offer had been tendered to Plaintiff before he withdrew, let alone that the end of his attorney-client relationship with Brunson had anything to do with settlement negotiations. The evidence was that Thompson played no role in shepherding the settlement negotiations, all of which occurred after his withdrawal.  At the June 6 hearing on his Motino to Withdraw, he mentioned his attorney's client claim only at the very end of the hearing, after the district court, upon granting him withdrawal, suggested to Brunson that as she proceeded *pro se* in the lawsuit, volunteer settlement assistance counsel and the services of the magistrate judge might be available

20

to her. Other than Thompson's obvious role in initiating the case against Defendants, the evidence did not establish that Thompson played any significant role in the settlement of this case, and he did not argue that he did so.

Nonetheless, the Court does not view Illinois law as excluding the possibility that an equitable attorney's lien might be valid if the attorney's efforts at least contributed to the client's achievement of settlement in some way. The Court knows of no Illinois case that limits the recoverable *quantum meruit* efforts to settlement negotiation alone. Rather, the Illinois cases allow equitable lien claims after withdrawal occasioned by a "good cause" in the form of "a complete breakdown in the attorney-client relationship." *Id.* at *3. Accordingly, even if Thompson's withdrawal is outside the settlement paradigm, the Court must look further into whether there was a complete breakdown in the relationship. As the Court sets forth further below, the Court cannot find that there was such a complete breakdown.

> **D.** **Thompson Has Not Demonstrated a "Complete Breakdown in the Attorney-Client Relationship" With Plaintiff Sufficient to Constitute "Good Cause" in Support of the Equitable Attorney's Lien After His Withdrawal.**

Besides the settlement paradigm, Illinois cases have recognized that other circumstances amounting to a "complete breakdown of the attorney-client relationship" could constitute good cause for an attorney to withdraw and thus still be able to pursue a *quantum meruit* claim for reasonable compensation. *See Reed Yates Farms*, 172 Ill. App. 3d at 527-28 (noting, as good cause grounds, client's refusal to pay past-due retainer fees and having filed a disciplinary complaint against the attorney); *Leoris*, 226 Ill. App. 3d at 597 (requiring evidence in the record to support finding of good cause for withdrawal where client's failure to pay fees or other factors were said to have precipitated a "complete breakdown in the attorney-client relationship"). The factual circumstances of an attorney's withdrawal might vary considerably in ways that would bear upon

21

the validity of an equitable fee lien.  For example, allowing an attorney to recover on an equitable theory from a client whom that attorney abandoned, for example, can hardly be equitable.  "It is a basic maxim of equity that [persons] who seek[s] equity must do equity."  *Gambino v. Boulevard Mort. Corp.*, 398 Ill. App. 3d 21, 60 (1st Dist. 2009).  The Illinois cases describing facts that would be "a complete breakdown" in the relationship do not suggest an exhaustive list but instead indicate that difficulties between attorney and client exist along a continuum, and thus in some situations, a relationship may pose great challenges for counsel but not be broken completely.  Considering Illinois law, we conclude that the facts of this case do not constitute such a "complete breakdown."

> **1. Thompson's Reliance on the Illinois Rules of Professional Conduct Does Not Establish a "Complete Breakdown" Because the Rules Did Not Require Withdrawal.**

Importantly, the Court does not see Thompson's withdrawal as unethical.  If the Rules of Professional Conduct had required Thompson's withdrawal, as he contends, the Court would have had little trouble finding that his withdrawal was for "good cause" under Illinois law and thus did not thwart his attempt to recover under an equitable attorney's lien under a *quantum meruit* theory.  But the rules did not require Thompson or TCLG to withdraw from representing Brunson in this case.

The Court begins with the observation that Illinois Rule of Professional Conduct "1.16(a)(6)" does not exist as cited by Thompson in the Motion to Withdraw and in support of his argument that he was ethically "required" to withdraw, Petition at 2, and as he mentioned again at the evidentiary hearing.  9/3/24 Tr. at 16.  Nor does a "Rule 1.16(a)(6)" exist in the model rules. American Bar Association, Model Rule of Professional Conduct 1.16 (April 14, 2020) ("ABA Model Rule 1.16"), https://www.americanbar.org/groups/professional_responsibility/publications /model_rules_of_professional_conduct/rule_1_16_declining_or_terminating_representation/.

22

Thompson seems to be referring to RPC 1.16(b)(6), and there is an important difference between the provisions of RPC 1.16(a) and 1.16(b). RPC 1.16(a) sets forth the circumstances under which a lawyer "shall" withdraw from a client representation, and the part of this rule cited by Thompson in the Motion to Withdraw was Rule 1.16(a)(1), which requires withdrawal "if the representation will result in violation of the Rules of Professional Conduct or other law." RPC 1.16(a)(1). Illinois Rule 1.16(b), on the other hand, lists the grounds for an attorney's discretionary withdrawal. RPC 1.16(b). Rule 1.16(b)(6) provides that an attorney "*may* withdraw from representing a client" if the representation "has been rendered unreasonably difficult by the client." RPC 1.16(b)(6) (emphasis added); *see also* ABA Model Rule 1.16(b), cmt. 7 (listing ground of "fundamental disagreement" between client and lawyer as among grounds for "optional withdrawal" under the rule). Nothing in Illinois Rule 1.16(b)(6) suggests that an attorney violates the rules by continuing to represent a client who is making the representation unreasonably difficult. Rule 1.16(b)(6) merely offers attorneys a way out of that situation. The Court could find no Illinois decision indicating that withdrawal under Rule 1.16(b)(6) is required if a client renders a representation unreasonably difficult, and the plain language of the rule makes clear that withdrawal is not required.

Accordingly, Thompson's argument that his withdrawal from representing Brunson in this case was required by the Illinois Rules of Professional Conduct, and thus that the withdrawal was for "good cause" for purposes of the enforceability of his equitable attorney's lien in this matter, falls flat. As the Court will explore further below, the Court was not persuaded that the facts adduced at the evidentiary hearing showed that Brunson was making the representation "unreasonably difficult," but even if she did, the Rules of Professional Conduct allowed Thompson

to remain in the case, though he was not required to do so.[2] Thompson's reliance on the Rules of Professional Conduct does not establish a complete breakdown in the attorney-client relationship in support of his equitable lien claim.

### 2. The District Court Did Not Find on June 6 That "Good Cause" for TCLG's Withdrawal Existed in the Sense Required by Illinois *Quantum Meruit* Doctrine.

Nor can Thompson establish that on June 6, in granting the Motion to Withdraw, the district court made any finding that Thompson's withdrawal was based on a complete breakdown in the attorney-client relationship under Illinois cases like *Kannewurf*, *McGill*, and *Dikmen*. Thompson argued that the district court implicitly found "grounds to withdraw" on June 6, 9/3/24 Tr. at 43, and that much is true, as in the existence of "grounds" to withdraw. But the June 6 telephonic hearing never addressed what those grounds were, or whether, as it at issue now, those grounds rose to the level of a complete breakdown in the attorney-client relationship. Per *Dikmen*, an evidentiary hearing is needed for that sort of finding, and the district court did not conduct that fort of hearing nor make that sort of finding.

Brunson's attendance at the June 6 hearing, and her not having objected to Thompson's withdrawal, is of no moment now that this Court is considering the evidence adduced at the September 3 evidentiary hearing on Thompson's lien claim and the issue not before the district court on June 6 – whether the withdrawal resulted from a complete breakdown in the relationship. Plaintiff testified credibly at the September 3 evidentiary hearing to having almost no understanding of the significance of the district court asking her whether she objected to the

---

[2] Thompson stated as much in the Motion to Withdraw, noting that "the Rules *allow* an attorney to withdraw 'if the representation . . . has been rendered unreasonably difficult by the client.'" Motion to Withdraw ⁋ 3 (emphasis added). But after citing RPC 1.16(a)(1) to suggest that his withdrawal was *required* under the rules, and namely RPC "1.16(a)(6)," Thompson argued the mandatory withdrawal point more explicitly by stating in the Motion to Withdraw that "counsel believes that the Rules of Professional Conduct *require* Counsel's withdrawal." *Id.* ⁋ 4 (emphasis added).

Motion to Withdraw. No inference can be drawn about her assent to Thompson's lien claim by her not having objected, as she testified not only to a lack of understanding of what it meant to object to the Motion to Withdraw, but also to a lack of understanding about the lien generally at this point in the case. *See id.* at 28. Other than Brunson's discussion with the district court about proceeding *pro se* and possibly settling the case, no other colloquy was had by anyone on the record at the June 6 hearing. Plaintiff made no other statements at the hearing, and the district court had no occasion to question her about why did not object, or to inquire into what had prompted Thompson's withdrawal.

Perhaps understandably, considering the privilege issues she later waived at the September 3 evidentiary hearing, she was not asked on June 6 about divergent views, as between TCLG and her, about litigation strategy, the answer to the Carmax counterclaim, the difficulties she later said she was having in communicating with Gill, or the difficulties TCLG has said it was having in communicating with her. No other facts about the circumstances surrounding the dissolution or end of the attorney-client relationship with Thompson were adduced at the June 6 hearing. And for its part, again understandably, the Motion to Withdraw did not elaborate on any facts with respect to Thompson's assertion about Plaintiff's unreasonableness, other than to say that she had rendered the representation unreasonably difficult. Motion to Withdraw ¶ 4. The record before the district court on June 6 offers no basis for the Court now to find that by granting the Motion to Withdraw upon hearing that Brunson had no objection, the district court intended to make or actually made any findings at all about whether the attorney-client relationship had suffered a "complete breakdown" so that "good cause" would support a *quantum meruit* yet to be litigated.

The district court itself delivered the *coup de grâce* to Thompson's argument that the district court made such a finding when, on June 6, Thompson asked the district court for its

reaction on how his attorney's lien should proceed after his withdrawal, and the district court unequivocally stated that "[t]hat's between you, your client, and the defendants, not me, so work it out." 6/6/24 Tr. at 9. The district court explicitly told Thompson and the parties that matters concerning Thompson's attorney's lien were not before the district court at that time and were thus left for Thompson and the parties to resolve on their own. With the district court having explicitly said on June 6 that the attorney's lien issue was not before it on that day, nothing the district court did by way of granting the Motion to Withdraw reasonably could be construed as an implicit finding – or any finding – that TCLG's withdrawal from its representation of Brunson resulted from a "complete breakdown of the attorney-client relationship" such that it was for "good cause" as Illinois courts have used that term in determining whether an equitable attorney's lien after withdrawal is valid and enforceable.

Given that neither his permissive withdrawal under Rule 1.16(b)(6) nor the district court's June 6 grant of the Motion to Withdraw offer Thompson an easy route to establishing that a complete breakdown in the attorney-client relationship precipitated his withdrawal, Thompson must establish it the old-fashioned way, by earning it. He must show that the relationship did break down completely. The Court addresses that question below.

### 3. Differences Between Brunson and TCLG About Litigation Strategy Did Not Give Rise To a "Complete Breakdown" in the Relationship, At Least on this Record.

The Court finds inapposite Thompson's citation to the Court, during the evidentiary hearing (9/3/24 Tr. at 17), of *Parker v. Four Seasons Hotel, Inc.*, 845 F.3d 807, 816 (7th Cir. 2017), and *Washington v. Sherwin Real Estate, Inc.*, 694 F.2d 1081, 1087-88 (7th Cir. 1982). These cases addressed not whether an Illinois attorney had a valid equitable lien after a withdrawal that could be deemed "good cause" under the Illinois common law of equitable liens, but rather whether

26

withdrawal itself is legally justifiable or within the discretion of the trial court allowing the withdrawal where lawyer and client "reach[] an impasse" as to how to proceed with a case, as in *Parker*, or where client refuses to follow the attorney's advice to accept a settlement offer and instead insists on going to trial, as in *Washington*. The Court nonetheless construes Thompson's analogy to *Parker* and *Washington* as stemming from his argument that the circumstances of his withdrawal here are similar to at least *Parker* and thus are sufficient to constitute a "complete breakdown" in the relationship. In other words, the Court does not disagree that a difference over strategy, if profound enough, could constitute a "complete breakdown" of the relationship for purposes of analyzing an Illinois *quantum meruit* equitable attorney's lien claim.

Probably the best Illinois case for Thompson on this point is *Forest Preserve District*, in which an attorney suing a forest preserve district for a client was held to have properly withdrawn and then pursued a *quantum meruit* fee claim amid two issues (as is evident from the opinion) coming between lawyer and client: (1) a disagreement about strategy concerning pursuing additional damages claims against the district, and (2) a breakdown in communication between the attorney and the client. 2017 IL App (1st) 170680 ¶¶ 11, 12. *Forest Preserve District* is thus superficially like the instant case, in that here, as of April 5, Brunson and TCLG had not yet reached an agreement about strategy in answering the Carmax counterclaim and in fact had a communications breakdown. But *Forest Preserve District* is distinguishable because the opinion states specifically that the client in that case "was unwilling to follow" the attorney's advice, *id.* ¶ 11, supporting an inference that there was finality to the disagreement about strategy and to the communications breakdown. Here, the record supports no such inference for at least two reasons.

First, the disagreement about strategy in this case is too bare bones on this record. Carmax had counterclaimed for the unpaid balance on Brunson's car loan. She either was in default or was

not, and if she was, she would have to admit liability or assert some sort of defense to the obligation. The evidence in the record from the filed documents and the evidentiary hearing tells us nothing more about the nature of that disagreement, or about the depth of it. At the same time, Thompson admitted at the argument phase of the evidentiary hearing that "[a] counterclaim by a lender is certainly not a surprise and it is certainly not uncommon." 9/3/24 Tr. at 46. If the entire case arose essentially from alleged misconduct during two attempts to repossess the Tesla that Carmax had sold to Brunson under a financing agreement, TCLG and Brunson had plenty of reason to know from the time of the decision to file the complaint that Brunson had at least some exposure to a Carmax counterclaim for the unpaid balance, yet this fundamental issue is said to have become an irreconcilable difference some four months into the representation and only after Carmax actually filed the counterclaim. There is much the Court does not know on this record about the differing views that Brunson and TCLG supposedly had about strategy in responding to the counterclaim, and frankly the Court does not know enough about the strategy issue to conclude that it was so profound or final as to constitute a complete breakdown in the relationship under the Illinois case law. The Court's analysis below of the communications issues between Brunson and TCLG demonstrate further that to the extent Brunson and TCLG had a true disagreement about strategy for responding to the Carmax counterclaim, that dispute had not solidified to the point where lawyer and client had taken such final positions that their differences fairly could be said to be irreconcilable – instead, they had more to discuss before reaching that point.

### 4. The Communications Issues Between Brunson and TCLG Did Not Give Rise to a "Complete Breakdown of the Attorney-Client Relationship."

Second, the Court's view of the strategy disagreement as insufficiently final was buttressed even by Thompson's repeated statements, at the evidentiary hearing, that TCLG's plan from April 5 onward for dealing with Brunson on the counterclaim was to "reconvene" with Brunson about

the strategy. 9/3/24 Tr. at 14, 37. From April 5 to at least mid-May, TCLG's plan was to "reconvene" with Brunson and run to ground the issue of what her answer to the counterclaim should say. But as of mid-May, they had not "reconvened," and each side at the hearing laid blame upon the other for why the "reconvening" had not happened by then. TCLG then concluded that it could withdraw (or perhaps incorrectly that it was being legally forced to withdraw), and even it could have withdrawn (as the Court believes it could have) under RPC 1.16(b)(6), at least Brunson did not see the relationship as over at the time TCLG filed the Motion to Withdraw. Looking at all of the communications and their underlying context as related by both parties at the evidentiary hearing, the Court cannot conclude that the difficulties that TCLG had in communicating with Brunson constituted a "complete breakdown of the attorney-client relationship" for purposes of the Illinois law of *quantum meruit* recovery on equitable attorney's liens, *Forest Preserve District* notwithstanding. That is, the relationship may have been damaged, but not completely. There was no "complete breakdown."

In fact, the Court found credible Brunson's testimony that the Motion to Withdraw surprised her, as she believed that she and TCLG (in the person of Gill) had an ongoing relationship in which they would catch up to each other, even if for a while they played "phone tag" during a period that, according to Brunson, included some medical or family issues both were experiencing, she testified. The Court is not taking issue with the decision TCLG made to terminate the representation because it was no longer willing to hunt Brunson down and wait out the communications issues in the meantime. But the Court is unpersuaded that the communications breakdown was hopeless, as the Court explains further below. As of May 16, two weeks before filing of the Motion to Withdraw, the district court had extended the counterclaim answer deadline by a full month to June 17. (D.E. 21.) Thompson's claim that the relationship was now

29

irretrievably broken, or that TCLG had its back to the wall, is pure speculation. Brunson certainly believed that she and Gill would circle back to each other. The unspecified and inchoate strategy disagreement as of April 5 on the non-complex issue of liability on the counterclaim (Brunson all along either had a defense to that counterclaim or did not), and the fact that by May 30, TCLG had not yet been able to finalize that discussion with her, do not amount to a complete breakdown in the attorney-client relationship as illustrated in *Forest Preserve District* or any of the other applicable Illinois cases reviewed by the Court on the Petition.

But the Court cannot complete its discussion of the communications issues between TCLG and Brunson without addressing what wound up as a central thrust of TCLG's argument at the evidentiary hearing: that "good cause" for withdrawal, for purposes of the survival of the equitable lien after withdrawal, is shown because Brunson breached the Fee Agreement when she and Gill lost touch in large part because she was, as she admitted at the hearing, not regularly reviewing and responding to TCLG's case status emails to her. TCLG's assertion that she breached the Fee Agreement and behaved so unreasonably (by not responding to the emails) as to have caused a complete breakdown in the relationship rests on the premise, stated by Thompson explicitly at the end of the evidentiary hearing, that Brunson agreed not only that she and TCLG would communicate by email, but also that email would be the predominant method of communication between them because TCLG "doesn't have an ability to text current clients," because such text communication with clients "is not a function of any of our active practice management software," and because "employees are not issued personal cell phones for communicating with clients," even as Thompson said that the firm does communicate with clients "via telephone." 9/3/24 Tr. at 44.

The Court has several problems with that assertion, including, first of all, Thompson's admission that at the very beginning of TCLG's attorney-client relationship with Brunson at

"intake," communication between the two was by "telephone, text and email." *Id.* at 36. That admission ignited the Court's considerable skepticism about Thompson's argument that TCLG somehow was not even equipped to communicate with clients like Brunson by text message yet could communicate with them by phone, considering the ubiquitousness of mobile communication devices with text messaging capability. Brunson's testimony that she told Gill that effective communication with her needed to be by text message was never rebutted by Thompson or Gill (who did not testify), further kindling the Court's skepticism about Thompson's claim that Brunson's lesser responsiveness to emails as opposed to text messages led to a complete breakdown in the attorney-client relationship.

The Court's skepticism of Thompson's email-only argument burned hotter once the Court credited Brunson's unrebutted testimony about having told Gill he needed to communicate with her by text message. That testimony carried an implied assertion that Brunson made at least a good-faith effort to communicate with TCLG, and that much was corroborated partially by Thompson's sworn admission that Brunson responded to TCLG's outreaches in the spring of 2024 at least twice, by (1) calling but not being able to reach Gill on April 30, and (2) emailing Gill on May 1. The hearing testimony by Brunson and Thompson showed that Gill as well as Brunson were not always available for attorney-client communications, as both had a lot happening with their own family lives and health issues, including, for Brunson, a surgery. Brunson's testimony that she told Gill she preferred text message communication also was consistent with her stating that she did so because she did not regularly check her email and sometimes had a full voice mailbox on her phone. In short, the Court finds that her unrebutted testimony was credible on this point, and that abiding by her request that TCLG communicate with her by text message under these circumstances was not unreasonable. Brunson pointedly asked, during the evidentiary

hearing, why TCLG did not abide by her request: "[I]f I had told them that I could be reached easier in texting, why they didn't oblige by that." *Id.* at 33. The Court had the same question, to which Thompson never provided a clear answer, other than his argument that under the Fee Agreement, Brunson obligated herself to communicate at least predominantly if not exclusively with TCLG by email on client representation issues.

But the language of the Fee Agreement with respect to the permitted method of communication in this attorney-client relationship transformed the Court's skepticism about Thompson's email-only argument into a roaring bonfire. At the hearing, Thompson argued that Brunson, in the Fee Agreement, made a contractual promise to communicate with TCLG predominantly by email and then broke that promise to the degree she insisted on text messaging instead. Paragraph 12 of the Fee Agreement instead made clear that email was *not* to be the exclusive method of communication between Brunson and TCLG, stating explicitly that TCLG attorneys "will always welcome any phone calls, letters, or *other means of communication.*" Fee Agreement ¶ 12 (emphasis added). Text messaging happens to be one "other" means of communication. It also happened to be Brunson's preferred means of communication with TCLG in this case. Brunson's insistence on text message communication in this relationship did not result in its complete breakdown.

That is not to say that Brunson was not a highly challenging client, or that representing her or communicating with her was not difficult in the spring of 2024. The attorneys at TCLG grappled with a problem they had reason to know existed since the start of the representation: The disputed repossession of the Tesla occurred because she owed a considerable amount of money to Carmax on her purchase of the Tesla. But contrary to what TCLG told the district court in the then-undisputed Motion to Withdraw, the Court does not see the communications breakdown between

Brunson and TCLG as Brunson having rendered the relationship totally beyond repair. A line of type or two in a text message, or even more than one text message, might have been all that was needed to keep the relationship going. At least Thompson, who has the burden as the petitioner on the lien claim, did not show otherwise. As a result, his *quantum meruit* equitable lien claim, dependent as it is in this case on a complete breakdown of the attorney-client relationship with Brunson, is left in ashes. The Court does not find "good cause" for Thompson's withdrawal from Brunson's representation under Illinois law governing Thompson's equitable lien claim. That lien is therefore unenforceable.

## CONCLUSION

For the foregoing reasons, the Court's adjudication of Thompson's statutory and equitable attorney's liens, after evidentiary hearing, results in the Court's decision that neither lien is valid or enforceable. The Petition is denied.

**SO ORDERED.**

ENTER:

**Gabriel A. Fuentes**
**U.S. Magistrate Judge**

**DATED: September 12, 2024**